UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

XAVIER PUCHA QUITUIZACA,

             Petitioner,

    v.                                                                20-CV-403-LJV
                                                                              DECISION & ORDER

WILLIAM P. BARR, et al.,

             Respondents.

---

The petitioner, Xavier Pucha Quituizaca, has been detained by the United States

Department of Homeland Security, Immigration and Customs Enforcement ("DHS")

since October 11, 2018—more than two years and two months—pending a final

determination regarding his removal.[1]  On June 15, 2020, this Court ordered the

respondents to release Pucha Quituizaca within fourteen days "unless a neutral

[decisionmaker] conduct[ed] an individualized hearing," in which the government bore

the burden of proof by clear and convincing evidence, "to determine whether his

continued detention [wa]s justified."  Docket Item 7 at 17-18.  Furthermore, this Court

---

[1] Pucha Quituizaca petitioned the Second Circuit to review the Board of
Immigration Appeals' decision and asked the court to stay his removal. *See Pucha
Quituizaca v. Barr*, No. 19-3470, Docket Item 1 (2d Cir. 2019).  Both those requests
remain pending.  Under DHS's forbearance agreement with the Second Circuit, "DHS
will not remove a [noncitizen] who has requested a stay of removal with a petition for
review of an immigration order of removal unless a government motion opposing the
stay is granted by the court or the [noncitizen's] stay motion is otherwise denied."
*Sankara v. Whitaker*, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019).  Therefore, as
this Court has held under similar circumstances, until the Second Circuit rules on Pucha
Quituizaca's petition or his request for a stay of his removal, the "forbearance
agreement [with DHS] amounts to a court ordered stay" of his removal.  *See Hemans v.
Searls*, 2019 WL 955353, at *3 (W.D.N.Y. Feb. 27, 2019); *Sankara*, 2019 WL 266462,
at *4.

found that because detention would not be justified unless it was "necessary to serve a compelling regulatory purpose," the decisionmaker had to consider whether "a less-restrictive alternative to detention" would suffice.  *Id.* at 18.

Now before the Court is Pucha Quituizaca's motion, Docket Item 16, to enforce this Court's conditional writ of habeas corpus, Docket Item 7.  Because the respondents failed to comply with this Court's June 15, 2020 order, the respondents shall release Pucha Quituizaca under conditions of supervision.

## **BACKGROUND**

On June 22, 2020, Pucha Quituizaca received a bond hearing before Immigration Judge ("IJ") Susan Aikman.[2]  Docket Item 8-2.  On July 15, 2020, the government filed a certification of compliance consisting of a declaration, Docket Item 8-1, and a copy of IJ Aikman's written decision, Docket Item 8-2.  That written decision, in its entirety, read: "flight risk, no relief available, no relatives to grant status, 13 years before seeking relief, 1 DWI*." Id.*  The government's declaration stated that IJ Aikman "noted that the government bore the burden of proof . . . by clear and convincing evidence," and that she "took account of the District Court's Decision and Order, ordering that . . . alternate conditions of release be considered" in finding that Pucha Quituizaca was a flight risk. Docket Item 8-1 at 3-4.  Based on those submissions, this Court found that the

---

[2] This Court assumes familiarity with the underlying facts and procedural history leading to its June 15, 2020 conditional writ, *see* Docket Item 7 at 2-3; *Pucha Quituizaca v. Barr*, 2020 WL 3166732 at \*1-\*2 (W.D.N.Y. June 15, 2020), and will refer only to the facts necessary to explain its decision.

government had shown *prima facie* compliance with the June 15, 2020 conditional writ and directed the Clerk of the Court to close the case.[3]  Docket Item 9.

Meanwhile, on August 13, 2020, the respondents appealed this Court's order granting Pucha Quituizaca a conditional writ of habeas corpus.  *See* Docket Item 10. That appeal remains pending before the Second Circuit.  *See Pucha Quituizaca*, No. 19-3470 (2d Cir. 2019).  Pucha Quituizaca likewise appealed IJ Aikman's denial of bond to the BIA, and that appeal also remains pending.  *See* Docket Item 18 at 2; Docket Item 26.

## ANALYSIS

### I.      JURISDICTION

"[O]rdering a petitioner's release is 'the very essence of habeas relief.'"  *Enoh v. Sessions*, 2017 WL 2080278, at *2 (W.D.N.Y. May 15, 2017) (quoting *Phifer v. Warden, U.S. Penitentiary, Terre Haute, Ind.*, 53 F.3d 859, 864 (7th Cir. 1995)).  "'Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him.'"  *Id.* (quoting *Fay v. Noia*, 372 U.S. 391,

---

[3] This assessment was done without the benefit of a transcript of the bond hearing.  Pucha Quituizaca now has provided the Court with that transcript, *see* Docket Item 16-1, along with his motion to enforce.  The government also relies on that transcript in its response and does not object to its accuracy.  *See* Docket Item 18. Because this Court did not have a copy of the transcript and relied only on the government's submission when it determined that the government made a *prima facie* showing of compliance, some of the Court's preliminary findings were inaccurate. *Compare, e.g.,* Docket Item 9 (stating that IJ Aikman found Pucha Quituizaca to be a danger to the community) *with* Docket Item 16-1 at 16 (IJ Aikman's oral decision declining to find that Pucha Quituizaca is a danger to the community).  Details of the bond hearing relevant to this decision and order and discussed in the analysis section below are taken from the transcript.

430-31 (1963)).  But "[d]istrict courts rightly favor conditional grants," which give the executive branch "the opportunity to cure [its] constitutional errors" and which appropriately recognize "comity among the co-equal [branches]."  *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006).

Of course, "conditional writs 'would be meaningless' if a habeas court could not determine compliance with them."  *Mason v. Mitchell*, 729 F.3d 545, 549 (6th Cir. 2013) (quoting *Satterlee v. Wolfenbarger*, 453 F.3d 362, 369 n.5 (6th Cir. 2006)).  So "a federal court always retains jurisdiction to enforce its lawful judgments, including habeas judgments, [and] the court has the authority to see that its judgment is fully effectuated."  *Gall v. Scroggy*, 603 F.3d 346, 352 (6th Cir. 2010).  In other words, as this Court already has found under similar circumstances, "this Court retained the power to grant [release] if the government failed to comply with [its] order."  *See Enoh*, *supra* at *2 (and cases cited therein); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 235 (W.D.N.Y. 2019).

8 U.S.C. § 1226(e) does not divest this Court of jurisdiction to review IJ Aikman's bond determination.  Section 1226(e) states:

> The Attorney General's discretionary judgment regarding the application of *this section* shall not be subject to review. No court may set aside any action or decision by the Attorney General under *this section* regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226(e) (emphases added).  This Court, like others in the Second Circuit, "is skeptical that the [June 22, 2020,] bond hearing constitute[d] a proceeding conducted under section 1226(e); rather, it was a court-ordered bond hearing that demanded procedural protections beyond those compelled by the statute itself."  *Gutierrez Cupido*

*v. Barr*, 2020 WL 103477, at *2 (W.D.N.Y. Jan. 9, 2020) (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 847-48 (2018)); *Darko v. Sessions*, 342 F. Supp. 3d 429, 434-35 (S.D.N.Y. 2018) ("[W]hile the Supreme Court held that § 1226(a) does not mandate that a clear and convincing evidence burden be placed on the government in bond hearings, it left open the question of whether the Due Process Clause does.").

Neither does section 1226(e) "deprive district courts of jurisdiction to determine whether an IJ followed a court order granting a bond hearing pursuant to the Fifth Amendment."  *See, e.g.*, *Blandon v. Barr*, 434 F. Supp. 3d 30, 36 (W.D.N.Y. 2020) (collecting cases); *see also Jennings*, 138 S. Ct. at 841 (quoting *Demore*, 538 U.S. at 516-17, 123 S.Ct. 1708) ("§ 1226(e) does not preclude 'challenges to the statutory framework that permits the alien's detention without bail,' " and only "precludes an alien from 'challenging a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release' ").  Therefore, section 1226(e) does not preclude review.  The Court is not reviewing IJ Aikman's discretionary judgment; it is deciding whether its order was followed—that is, "whether [Pucha Quituizaca] received the due process to which he was entitled."  *See Hechavarria*, 358 F. Supp. 3d at 236.

Finally, the respondents' appeal of this Court's conditional order, Docket Item 10, does not deprive the Court of jurisdiction over the motion to enforce.  The "filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal."  *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 378-79 (1985).  "The divestiture of jurisdiction rule is, however, not a per se rule." *United States v. Rodgers*, 101 F.3d 247, 251 (2d

Cir. 1996).  "One exception is that, absent a stay, a district court retains jurisdiction to enforce its orders and judgments despite an appeal." *Apollinaire v. Barr*, 2019 WL 4023560, at *2 (W.D.N.Y. Aug. 27, 2019); *see, e.g.*, *Blandon*, 434 F. Supp. 3d at 36–37 (holding that a notice of appeal did not divest the court of jurisdiction over the petitioner's motion to enforce); *Enoh*, *supra* at *4-5 (holding that, despite a notice of appeal, the court retained jurisdiction over a motion to enforce).

## II.    TIMELINESS

The government argues that Pucha Quituizaca's motion to enforce should be construed as a motion to alter or amend a judgment, *see* Fed. R. Civ. P. 59(e), or as a motion for relief from a judgment, *see* Fed. R. Civ. P. 60., and that under either rule the motion was untimely.  Docket Item 18 at 4-5.  The government asserts that the only appropriate time for Pucha Quituizaca to have filed a motion to enforce was after the government filed its certification of compliance but before the Court's text order finding *prima facie* compliance[4] with its conditional writ—a period of one month.  *See* Docket Item 18 at 4.  The government does not cite any law to support this proposition; nor is there any such requirement in any rule of civil procedure, in the Court's decision and order granting the conditional writ, or anywhere else that this Court can find.

---

[4] *Black's Law Dictionary* defines *prima facie* as "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue"; "[a]t first sight; on first appearance but subject to further evidence or information." *Prima Facie*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The language of this Court's text order, then, implies that the petitioner could challenge the finding—something this Court finds particularly appropriate here because, at the time of its initial review, it lacked the benefit of a transcript of the bond hearing.

Conditional writs of habeas corpus are final orders that "ordinarily and ideally operate automatically." *See Gentry*, 456 F.3d at 692. "Nevertheless, district courts retain jurisdiction to execute a lawful judgment when it becomes necessary." *Id.* Because Pucha Quituizaca seeks to enforce the June 15, 2020 conditional writ—not to alter, amend, or be relieved from complying with it—the Court finds that the motion was not made under Rule 59(e) or Rule 60.[5]

The Court also is persuaded by Pucha Quituizaca's argument that he acted diligently in moving to enforce. First, because Pucha Quituizaca remains detained in a facility with prison-like conditions, "every aspect of litigation takes him longer." Docket Item 21 at 9. Second, he brought his habeas petition *pro se* and apparently did not have counsel until recently. *Id.* at 9-10. Third, the government was not prejudiced by the ten-week delay between the Court's finding of *prima facie* compliance and the motion to enforce. *Id.* at 10. And fourth, because the IJ's written decision was so sparse, a written transcript of the bond hearing was necessary for "a viable motion to enforce"; but the Executive Office of Immigration Review does not provide transcripts by default, and Pucha Quituizaca was unable to obtain a recording of the hearing on his own, "let alone pay for the necessary transcription service," without the aid of *pro bono*

---

[5] Even if the motion were construed as a motion for relief from this Court's text order finding *prima facie* compliance with its conditional writ, it is not at all clear that the motion would be untimely under Rule 60. While a motion to alter or amend a judgment must be filed 28 days after entry of judgment, Fed. R. Civ. P. 59(e), a motion for relief from judgment "must be made within a reasonable time," Fed. R. Civ. P. 60(c)(1) (further noting that if brought for certain reasons, the motion must be brought "no more than a year after the entry of the judgment . . ."). Here, Pucha Quituizaca filed his motion to enforce a little more than ten weeks after the Court found *prima facie* compliance. *See* Docket Items 14-16.

counsel. *Id.* For all those reasons, the Court finds that Pucha Quituizaca's motion to enforce is timely.

## III.    EXHAUSTION

Pucha Quituizaca appealed IJ Aikman's bond determination to the BIA. *See* Docket Item 18 at 2. The respondents contend that because that appeal remains pending, this Court should require Pucha Quituizaca to exhaust his administrative remedies before considering his motion to enforce. The Court disagrees.

As an initial matter, "[t]here is no statutory requirement of administrative exhaustion before immigration detention may be challenged in federal court by a writ of habeas corpus; however, such exhaustion is generally required as a prudential matter." *Paz Nativi v. Shanahan*, No. 16-CV-8496 (JPO), 2017 WL 281751, at \*1-2 (S.D.N.Y. Jan. 23, 2017) (collecting cases). Nevertheless, exhaustion of administrative remedies may not be required when: (1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 740 (2d Cir. 1992) (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)).

"[T]he BIA does not have jurisdiction to adjudicate constitutional issues" such as the one at issue here. *See United States v. Gonzalez-Roque*, 301 F.3d 39, 48 (2d Cir. 2002); *Matter of Rodriguez-Carrillo*, 22 I & N. Dec. 1031, 1035 (BIA 1999) ("[N]either the Immigration Judge nor this Board may rule on the constitutionality of the statutes that we administer."). Therefore, as this Court has found under similar circumstances,

requiring exhaustion before considering whether to enforce a decision made on constitutional grounds would be futile. *See Hechavarria*, 358 F. Supp. 3d at 238 (holding that "the third and fourth exhaustion exceptions—the futility of an administrative appeal and a substantial constitutional question . . . also apply to this case" because the motion for enforcement raised constitutional questions (citation omitted)). Considering Pucha Quituizaca's already prolonged detention and this Court's June 15, 2020 order requiring a constitutionally sufficient bond hearing or release, exhaustion of administrative remedies would not be appropriate. *See id.* at 237-38 (internal quotation marks omitted) (quoting *Enoh*, 2017 WL 2080278, at *3) ("[B]ecause of delays inherent in the administrative process, BIA review would result in the very harm that the bond hearing was designed to prevent: prolonged detention without due process during lengthy and backlogged removal proceedings.")

## IV.     COMPLIANCE WITH THIS COURT'S CONDITIONAL WRIT

Back in June 2020, "Pucha Quituizaca's detention" had already been "unreasonably prolonged." *Pucha Quituizaca v. Barr*, WL 3166732, at *6 (W.D.N.Y. June 15, 2020). At the time this Court ordered that he receive a meaningful hearing, Pucha Quituizaca had been detained for more than twenty months. *Id.* at *1. He now has been detained over two years.

After applying the *Mathews v. Eldridge* balancing test, 424 U.S. 319, 335 (1976), this Court previously concluded that Pucha Quituizaca's detention could not continue without review by a neutral decisionmaker. *See Pucha Quituizaca*, *supra* at *8. Specifically, the government was required to "demonstrate[] by clear and convincing evidence before a neutral [decisionmaker] that [detention] is necessary to serve[] a

compelling regulatory purpose." *Id.* As part of that calculus, the decisionmaker was to decide "whether there is clear and convincing evidence that there are no less-restrictive alternatives to physical detention, including release on bond in an amount the petitioner can reasonably afford, with or without conditions, that also would reasonably address those same regulatory purposes." *Id.*

Pucha Quituizaca argues that for two reasons he did not receive the meaningful hearing that due process required. Docket Item 16 at 7-14. First, he argues that IJ Aikman erroneously shifted the burden of proof from the government to him, requiring him to disprove flight risk and to prove his ability to satisfy a bond. *Id.* at 7-11. Second, he argues that IJ Aikman failed to consider alternatives to detention as required by this Court's order. *Id.* at 11-15. This Court agrees that the government did not comply with the Court's conditional writ.

### A. BURDEN OF PROOF

"In reviewing [the petitioner's] motion to enforce, 'it is important to emphasize that the Court's task is narrow: it is to determine whether [the respondents] complied with the Decision and Order, not to review the hearing evidence *de novo*[.]'" *Blandon*, 434 F. Supp. 3d at 38 (citing *Apollinaire*, 2019 WL 4023560, at *3) (collecting cases). Therefore, this Court approaches the question now posed by Pucha Quituizaca "mindful of [its] obligation to afford . . . a degree of deference to the [factfinder's] determinations." *United States v. Tortora*, 922 F.2d 880, 882 (1st Cir. 1990).

When examining any evidentiary proceeding and the adjudicator's opinion, there are at least two ways to challenge whether the adjudicator applied the correct standard of proof. First, as this Court has noted, a challenge may be based on the contention

that the decisionmaker erred because the evidence could not—as a matter of law—have supported the adjudicator's conclusion. *See Nguti v. Sessions*, 2017 WL 5891328, at *2 (W.D.N.Y. Nov. 29, 2017); *Enoh*, *supra* at *8. Second, the adjudicator's decision may make it clear that the correct standard was not applied.

As this Court and others have said, the clear and convincing evidence burden of proof "requires the government to prove that a factual contention is 'highly probable.'" *Enoh*, *supra* at *9 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). Moreover, "[t]he process due even to excludable [non-citizens] requires an opportunity for an evaluation of the individual's *current* . . . risk of flight." *Chi Thon Ngo v. I.N.S., 192 F.3d 390, 398 (3rd Cir. 1999)* (emphasis added). Here, IJ Aikman based her determination that Pucha Quituizaca's risk of flight was highly probable largely on his past infractions, as well as his pending immigration review and the inability of his family members to provide him with legal status. *See* Docket Item 16-1 at 16-17.

But this Court need not wade too deeply into whether a reasonable factfinder could have concluded that the government met its burden of proof at Pucha Quituizaca's hearing because it is clear from the transcript that IJ Aikman did not apply the correct standard. In fact, she impermissibly shifted the burden of proof to Pucha Quituizaca when she required him to disprove risk of flight by demonstrating his ability to satisfy a bond. *See Blandon*, 434 F. Supp. 3d at 40 ("the improper allocation of the burden of proof is further demonstrated by his emphasis on Petitioner's failure to present evidence at the bond hearing.").

During the hearing, IJ Aikman noted that she had no specific financial information demonstrating Pucha Quituizaca's ability to satisfy a  bond or his family's ability to

11

support him.[6]  *See* Docket Item 16-1 at 16-17 (noting that no bond could be set because although Pucha Quituizaca provided "letters of support, there's no real financial information to show that any of these sponsors make sufficient money" and there was a "lack of financials" in the record).  She seems to reason that because Pucha Quituizaca may not have enough money to satisfy a bond, she could not set any bond whatsoever. *Id.* at 17 ("I see no financials to show that the respondent would be able to afford any sort of bond.  So, even setting a bond is outside this court's ability at this point.").  This circular reasoning is particularly troubling not only because it fails to comply with this Court's order by shifting the burden of proof, but also because it disproportionately impacts low-income individuals like Pucha Quituizaca.  *See id.* (stating that because there was no evidence that Pucha Quituizaca could afford any bond, IJ Aikman would not set a bond in any amount).  And the IJ certainly could have set a bond in *some* amount, putting the ball in Pucha Quituizaca's court to suggest something more reasonable that he and his family might afford.

The government argues that IJ Aikman properly shifted the burden to Pucha Quituizaca because "without actual financial date, the Immigration Judge could reasonably find that a mere pledge by a sponsor that he would support the Petitioner is not sufficient to show that the sponsor would be able to afford any bond set."  Docket Item 18 at 8.  This Court's prior order, however, placed the burden of proof *on the government*.  *Pucha Quituizaca, supra* at *8.  So if the government wanted the IJ to rule

---

[6] The government and the petitioner disagree as to whether Pucha Quituizaca would be eligible for work authorization if released.  *Compare* Docket Item 18 at 8 (noting that government counsel successfully argues that Pucha Quituizaca lacks work authorization) *with* Docket Item 21 at 15 (citing 8 C.F. R. 274a.12(c)(18) and arguing that Pucha Quituizaca "*would* be able to legally work if the Government released him").

out a bond as sufficient, it was incumbent on the government to show why a bond would not suffice—perhaps by showing why money would not be a sufficient incentive to Pucha Quituizaca to reduce his risk of flight or at least by showing that the petitioner and his family would not cooperate in the disclosure of financial information.  But simply saying that the absence of financial information requires denial of a bond clearly shifts the burden of proof.

What is more, simply refusing to set a bond because of perceived indigency without addressing financial considerations gives the reasons behind detention—and possible alternatives, *see infra* at IV(B)—short shrift.   Because immigration detention must "bear[ ] a reasonable relation to [its] purpose," *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), the "connection between detention for failure to post a bond and legitimate governmental purposes" is satisfied only "if there is first a consideration of financial circumstances and alternative ways of serving that purpose."  *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (citing *Bearden v. Georgia*, 461 U.S. 660, 672-73 (1983)).[7]  Denying a bond because someone probably is too poor to satisfy a

_____

[7] Beginning with *Griffin v. Illinois*, 351 U.S. 12 (1956), the Supreme Court has repeatedly held that the Fourteenth Amendment prohibits denying equal access to justice in the criminal context without consideration of ability to pay or alternatives to detention.  *See Bearden*, 461 U.S. at 664-65 (and cases cited therein).  Perhaps most relevant in that line of cases is *Bearden* itself, where the Supreme Court required consideration of alternatives to detention and the defendant's ability to pay before imprisonment for failure to pay a fine.  *Id.* at 672-73 (holding that "[o]nly if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay," because to do otherwise "would be contrary to the fundamental fairness required by the Fourteenth Amendment").  *Id.*  At least one circuit has held that these principles apply in the immigration context.  *See Hernandez,* 872 F.3d at 991-92, 999.  And this Court is persuaded that due process requires similar considerations to justify a noncitizens' continued immigration detention after it has become unreasonably prolonged.

13

bond fails to establish a connection between continued immigration detention and its legitimate governmental purpose of reasonably ensuring against risk of flight.

Finally, the government observes that IJ Aikman "acknowledged that the hearing was being conducted pursuant to the District Court's June 15, 2020, Decision and Order," Docket Item 18 at 5, an order that required the government to bear the burden of proof by clear and convincing evidence. *Id.* at 6.  Therefore, the government reasons, the IJ *must have* applied the correct burden of proof.  *See id.* at 5-6.  But again as this Court has noted under similar circumstances,  "the mere utterance of the correct standard of proof in the IJ's decision is insufficient to demonstrate that it was applied," *see Hechavarria*, 358 F. Supp 3.d at 241.  And that is especially so when the IJ implicitly shifted the burden to Pucha Quituizaca to prove ability to pay.

### B.  ALTERNATIVES TO DETENTION

IJ Aikman also failed to meaningfully consider any plausible, less-restrictive alternative to continued detention as required by this Court's prior order.  In that order, this Court explained that "[w]hether detention is necessary to serve a compelling regulatory purpose *requires* consideration of whether a less-restrictive alternative to detention would also address the government's interests."  *Pucha Quituizaca*, *supra* at *8 (emphasis added).  *Cf. United States v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less[-]restrictive alternative is offered to a" regulation burdening a constitutional right, "it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").  That did not happen here.

At the hearing, counsel for Pucha Quituizaca offered a plausible, less-restrictive alternative to detention: She asked the IJ to place Pucha Quituizaca "under an order of

14

supervision which requires regular checking in with ICE or with the ISAP program, which requires the use of an ankle bracelet and unannounced home visits." Docket Item 16-1 at 15. DHS also submitted a letter from Michael K. Ball, the Assistant Officer in Charge at the Buffalo Federal Detention Facility, outlining "multiple alternatives to detention . . . including the use of 'electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting.'" *See* Docket Item 16 at 12. But the IJ did not meaningfully consider Pucha Quituizaca's proffered alternatives—or really any alternative, for that matter. *See* Docket Item 16-1 at 17 ("although this court is told to consider alternatives to detention, there seems to be a knowledge gap with the district courts"). Instead, IJ Aikman focused on the difference between a district judge's power to enforce alternatives to detention and an IJ's power to enforce such conditions. *Id.* at 17-18 ("this court has no teeth to enforce [alternatives to detention]"). And she suggested that what she generously called the district courts' "gap of knowledge" was to blame for courts like this one instructing IJs to consider alternatives to detention. *See id.* at 17 (explaining that "although this court is told to consider alternatives to detention, there seems to be a knowledge gap with the district courts," and "[t]his is where the gap in knowledge seems to come in").

So while she paid lip service to this Court's order, IJ Aikman never really considered any alternatives to detention. She never explained why the government's evidence made it highly probable that neither "regularly checking in with ICE," nor the "use of an ankle bracelet and unannounced home visits," nor a bond, nor any of the conditions listed in the letter from DHS would effectively serve the government's interest in limiting risk of flight. Instead, she simply stated that "this court has looked at the

15

alternatives to detention and finds that none of them are actually enforceable, and therefore do not represent viable options." Docket Item 16-1 at 17. That comes close to an explicit statement that contrary to this Court's order that she do so, the IJ would *not* consider alternatives to detention because she could not enforce them. What is more, her unwillingness to meaningfully consider alternatives to detention stands in stark contrast to the many immigrants across the country whom DHS regularly monitors on conditions of release. *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (noting that alternatives to detention serve the same interest as a bond, especially given "the empirically demonstrated effectiveness of such conditions at meeting the government's interest in ensuring future appearances"); *Hechavarria*, 358 F.Supp.3d 227 at 244 n.13 (allowing DHS to set appropriate conditions of release because the agency would be the one to monitor the petitioner).

And setting conditions on her own was not IJ Aikman's only option. She could have asked the attorney for DHS to confirm which conditions the department would be able to enforce. She could have ordered release under any of the conditions outlined in Mr. Ball's letter as determined by DHS. She could have asked for more financial information from the petitioner's family upon which to base a reasonable bond. She did none of this. Instead, she simply declined to consider alternatives to detention that she herself did not have the power to enforce. And that was not sufficient to comply with this Court's order.

## V.     REMEDY

This Court recognizes that it should consider whether the government has established "that there is a risk that [Pucha Quituizaca] will pose a danger to the public if

16

released, [and] take that factor into consideration" in deciding whether to release him as the habeas remedy.  *See Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).  Likewise, the Court recognizes that "possibility of flight should be taken into consideration" as well. *Id.*  This Court has done just that.

This Court agrees with IJ Aikman that Pucha Quituizaca does not pose a danger to the community.  *See* Docket Item 16-1 at 16 (stating that she did not find Pucha Quituizaca to be a danger to the community).  This Court also recognizes that no one can predict with certainty whether Pucha Quituizaca will flee once released.  *See, e.g.*, *id.* (IJ Aikman's finding that although the petitioner "does have deep ties to the community, none of them can give him status in the United States."); *id.* at 17 (IJ Aikman's noting that Pucha Quituizaca's disregard for this country's laws resulted in convictions for driving without a license and driving under the influence).  There always is some risk that a detained or incarcerated person who is released will engage in conduct demonstrating that his release was a mistake.  But risk alone cannot justify keeping someone detained forever.

Releasing Pucha Quituizaca—even on conditions—is a risk.  But the government has not demonstrated to anyone that it is highly probable that no condition or combination of conditions of release would suffice to serve its interest in minimizing risk of flight.  Therefore, and for all the reasons stated above and in this Court's prior decision, the due process to which Pucha Quituizaca is entitled after more than two years of immigration detention necessitates taking the risk associated with his release. The respondents shall release Pucha Quituizaca on conditions that will reduce—not eliminate—the risk that his release poses.

## **CONCLUSION**

For the reasons stated above, Pucha Quituizaca's motion to enforce this Court's order dated June 15, 2020, is GRANTED. The respondents shall release Pucha Quituizaca from custody as soon as practicable, but no later than ten days from the date of this order, under reasonable and appropriate conditions of supervision,[8] all at the government's expense.[9] The respondents shall file a report demonstrating compliance within thirty days of the date of this order.

SO ORDERED.

Dated:   January 5, 2021

       Buffalo, New York

                LAWRENCE J. VILARDO
                UNITED STATES DISTRICT JUDGE

---

[8] Because DHS will monitor any release conditions, this Court thinks it best to allow DHS to impose those that it determines are necessary. *See Hechavarria*, 358 F. Supp. 3d at 243; *Hassoun v. Sessions*, 2019 WL 78984, at *7-*8 (W.D.N.Y. Jan. 2, 2019); *Ramos v. Sessions*, 293 F. Supp. 3d 1021, 1038 (N.D. Cal. 2018); *Enoh, supra* at *11; *Judulang v. Chertoff*, 562 F. Supp.2d 1119, 1127 (S.D. Cal. 2008).

[9] Any inability to pay should not be used as an excuse to deprive Pucha Quituizaca of his fundamental right to liberty. *Cf. Bearden*, 461 U.S. at 674; *Griffin*, 351 U.S. at 17-19.